## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN S.,[1] | : | Case No. 2:24-cv-01720 |
| | : | |
| Plaintiff, | : | Chief District Judge Sarah D. Morrison |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION[2]

Plaintiff filed applications for Medicare-Qualified Government Employee

(MQGE) benefits under Title II and Supplemental Security Income (SSI) under Title XVI

in February 2017. After a hearing at Plaintiff's request, an Administrative Law Judge

(ALJ) concluded that Plaintiff was not eligible for benefits because he was not under a

"disability" as defined in the Social Security Act. After the Appeals Council denied

Plaintiff's request for review of that decision, Plaintiff filed an action with this Court.[3]

The Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C.

§ 405(g). The Appeals Council remanded the case pursuant to the District Court's order.

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendations within the specified time period.

[3] Assigned to Magistrate Judge Norah McCann King, Case Number 3:20-cv-00281.

A different ALJ held another hearing and again concluded that Plaintiff was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review of that decision, and Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, it is recommended that the Court REVERSE the Commissioner's decision and REMAND for further proceedings.

## I.      BACKGROUND

Plaintiff asserts that he was under a disability from February 8, 2017 to August 25, 2021.[4] He was forty-six years old on the alleged disability onset date and turned fifty years old prior to the end of the closed period. Accordingly, Plaintiff was initially considered a "younger person" under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).[5] He then changed age categories to a "person closely

---

[4] Plaintiff initially asserted that his disability began on March 31, 2014. (AR, Doc. No. 6-5 at PageID 306.) Prior to the issuance of the first ALJ's decision, Plaintiff amended his alleged disability onset date to February 8, 2017. (*Id.* at PageID 365.) During the second administrative hearing, Plaintiff affirmed the February 8, 2017 amended alleged onset date but requested a closed period of disability through August 25, 2021. (AR, Doc. No. 6-11 at PageID 1836; *see also* AR, Doc. No. 6-14 at PageID 2125.)

[5] The same legal standards apply to applications for Disability Insurance Benefits and Medicare benefits based on Medicare qualified government employment. *See* 42 U.S.C. § 426(b)(2)(C)(ii); S.S.A. POMS DI 25501.365, Established Onset for Medicare Qualified Government Employee (MQGE) Claims (last updated Jan. 10, 2023); *Dimas v. Kijakazi*, No. CV 20-0345 JHR, 2021 WL 4847272, at *1 (D.N.M. Oct. 18, 2021). The remaining citations will identify only the pertinent Disability Insurance Benefits Regulations, as they are similar in all relevant respects to the corresponding Supplemental Security Income Regulations.

approaching advanced age." 20 C.F.R. § 404.1563(d).  Plaintiff has a "high school

education and above." *See* 20 C.F.R. § 404.1564(b)(4).

      The evidence in the Administrative Record ("AR," Doc. No.  6) is summarized in

the ALJ's decision ("Decision," Doc. No. 6-11 at PageID 1781-1823), Plaintiff's

Statement of Errors ("SE," Doc. No. 7), the Commissioner's Memorandum in Opposition

("Mem. In Opp.," Doc. No. 9), and Plaintiff's Reply Memorandum ("Reply," Doc. No.

10). Rather than repeat these summaries, the Court will discuss the pertinent evidence in

its analysis below.

## II.    STANDARD OF REVIEW

      The Social Security Administration provides MQGE benefits and SSI to

individuals who are under a "disability," among other eligibility requirements. *Bowen v.

City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a).

The term "disability" means "the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which . . . has lasted or can

be expected to last for a continuous period of not less than 12 months." 20 C.F.R.

§ 404.1505(a).

      This Court's review of an ALJ's unfavorable decision is limited to two inquiries:

"whether the ALJ applied the correct legal standards and whether the findings of the ALJ

are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive.").

"Unless the ALJ has failed to apply the correct legal standards or has made findings of

fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

4

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III. FACTS

### A. The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

Step 1: Plaintiff has not engaged in substantial gainful activity since March 31, 2014, the alleged onset date.

Step 2: He has the severe impairments of pudendal neuralgia/entrapment syndrome, hypertension, a depressive disorder, obsessive-compulsive disorder (OCD), an anxiety disorder, and a pain disorder.

Step 3: He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: His residual functional capacity (RFC), or the most he can do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "He is able to sit for six hours in an eight-hour workday, and he is able to stand and/or walk for four hours in an eight-hour workday. He is limited to no kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds with occasional balancing, stooping, and climbing of ramps and stairs. He is limited to no exposure to vibration and hazards, such as unprotected heights or moving mechanical parts, and he is limited to jobs with no requirement to perform commercial

driving as part of job duties. He is limited to unskilled, simple, routine, repetitive tasks of no more than three steps at a time. He is unable to perform at a production-rate pace, such as assembly line work, but he can perform goal-oriented work, such as an office cleaner. He is limited to occasional changes in an otherwise routine work setting with those changes explained in advance to allow time for adjustment to new expectations."

He is unable to perform any of his past relevant work.

Step 5:    Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.

(Decision, Doc. No. 6-11 at PageID 1787-1810.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability and so is not entitled to benefits. (*Id.* at PageID 1810.)

**B.    Treating Neurologist Aaron Filler, M.D.**

The ALJ considered several opinions from Plaintiff's treating neurologist, Dr. Aaron Filler, M.D.

**1.    November 2017 opinion**

In a November 2017 letter, Dr. Filler summarized Plaintiff's treatment. (AR, Doc. No. 6-7 at PageID 858.) He first saw Plaintiff on March 15, 2015.[6] Dr. Filler stated that Plaintiff did "quite well" until he injured the surgical site in November 2016. (*Id.*) Dr. Filler stated that Plaintiff "has had quite a bit of recurrence since then, which has not relented," and he had "not respond[ed] to medication." (*Id.* at PageID 857-58.) Dr. Filler reported that when he saw Plaintiff in June 2017, he again recommended surgery because

---

[6] Dr. Filler's treatment notes indicate that he performed surgical resection of the piriformis muscle and neuroplasty of the pudendal nerve on March 24, 2015. (AR, Doc. No. 6-7 at PageID 484.)

an examination was "very positive for a pudendal nerve neuralgia recurrence." (*Id.* at PageID 857.) Dr. Filler opined that Plaintiff was unable to sit, stand, or walk for more than ten to fifteen minutes. (AR, Doc. No. 6-7 at PageID 857.) He opined that Plaintiff was therefore "not able to work at this time." (*Id.*) Dr. Filler also stated: "Because of [Plaintiff's] nerve pain, he is not able to carry out his usual work and has not been able to gain or keep employment for some time." (*Id.*)

The ALJ gave "some weight" to Dr. Filler's November 2017 opinion. (Decision, Doc. No. 6-11 at PageID 1805.) The ALJ reasoned that "Dr. Filler rarely examined [Plaintiff] and was therefore substantially relying on [Plaintiff's] subjective reports based on telephone calls (Exhibits 1F-54F)." (*Id.*) The ALJ concluded that Dr. Filler's most recent examination "does not support the limitations opined, as [Plaintiff] demonstrated good strength in the bilateral knees, plantar flexion, and dorsiflexion, and he had no reproduction of symptoms with restricted motion of the hip in a seated position despite sensitivity (Exhibit 14F/36)." (*Id.*) The ALJ also explained that "records from providers that saw him more frequently indicate better functioning than opined" and that "[w]ith rare exceptions, Plaintiff generally presents with an unremarkable gait and adequate strength (Exhibits 1F-54F)." (*Id.*) According to the ALJ:

> When strength was reduced, it improved when participating in physical therapy and receiving injections (e.g. Exhibit 45F/99-100). Even during the closed period recommended for review by the Court, his specialist noted good strength in the bilateral knees and with plantar flexion and dorsiflexion with no reproduction of symptoms with restricted motion of the hip in a seated position (Exhibit 14F/36). Furthermore, examinations usually indicate that he is not in acute distress, even during emergency room visits for his pudendal neuralgia (Exhibits 1F-54F).

7

(*Id.*) The ALJ also stated that Dr. Filler's November 2017 opinion addressed Plaintiff's physical abilities and was "not internally inconsistent, unlike most of Dr. Filler's other opinions (Exhibit 28F/4)." (*Id.*)

### 2. December 2018 opinion

In a December 2018 Mental Impairment Questionnaire, Dr. Filler indicated that Plaintiff would be off task for ten percent of the time during a typical workweek, "due to physical/psychological problems." (AR, Doc. No. 6-7 at PageID 848.) Dr. Filler also indicated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a month. (*Id.*) Dr. Filler checked boxes to indicate that Plaintiff was extremely limited (defined as "not able to function . . . independently, appropriately, effectively, and on a sustained basis) in the following abilities: working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; sustaining an ordinary routine and regular attendance at work; working a full day without needing more than the allotted number or length of rest periods; and setting realistic goals. (*Id.* at PageID 849.) Dr. Filler indicated marked impairment (defined as a "seriously limited ability to function . . . independently, appropriately, effectively, and on a sustained basis, but not precluded") in the ability to adapt to changes and to distinguish between acceptable and unacceptable work performance. (*Id.*)

According to Dr. Filler, Plaintiff was extremely limited in his overall ability to regulate his emotions, control his behavior, and maintain well-being in a work setting. (*Id.* at PageID 850.) Dr. Filler concluded that Plaintiff was unable to "perform regular,

8

full-time, competitive work (including jobs consisting of simple, routine tasks) on a sustained basis without missing work more than two times per month, being off-task more than [fifteen percent] of the workday, or needing additional breaks," due to his impairments, medical appointments, and treatment. (*Id.*)

The ALJ gave "minimal weight" to Dr. Filler's December 2018 opinion. (Decision, Doc. No. 6-11 at PageID 1805.) The ALJ explained that Dr. Filler "noted that he was not [Plaintiff's] psychiatrist and did not identify any psychological symptoms or limitations," and "did not offer any explanation for his opinion." (*Id.* at PageID 1805-06.) According to the ALJ, the opinion was "internally inconsistent by discussing mental limitations while indicating he was not qualified to evaluate mental impairments." (*Id.* at PageID 1806.) Further, the ALJ reasoned that the opinion was unsupported by Dr. Filler's treatment notes, "which reflect that [Plaintiff] was doing 'quite well with very good progress and relief of symptoms' in November 2018, shortly before the opinion was offered (Exhibit 24F/1)." (*Id.*) The ALJ also cited Dr. Filler's January 2019 treatment note, which reported that Plaintiff "acknowledged to Dr. Filler that his pain was being controlled well (Exhibit 35F/1)." (*Id.*) The ALJ also explained that the opinion was unsupported by other mental status examinations in the record, "which do not reflect significant issues with maintaining attention, concentration, persistence, and pace (Exhibits 1F-54F)." (*Id.*) Additionally, the ALJ commented: "[Plaintiff's] adequate strength and gait, particularly around the time the opinion was provided, is not consistent with pain that causes such concentration issues (Exhibits 1F-54F)." (*Id.*)

9

### 3.    February 2019 opinion

Dr. Filler completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form in February 2019. (AR, Doc. No. 6-8 at PageID 1116-20.) Dr. Filler opined that Plaintiff could occasionally lift and carry no more than three pounds. (*Id.* at PageID 1117.) In support of this limitation, Dr. Filler explained that a physical examination showed limited hip rotation and that "this limits balance and carrying." (*Id.* at PageID 1116.) Dr. Filler also opined that Plaintiff could stand and walk for fifteen minutes at a time and for a total of two hours in an eight-hour workday. Dr. Filler explained that Plaintiff demonstrated severe buttock pain upon physical examination, which "limit[ed] standing for long periods." (*Id.* at PageID 1117.) According to Dr. Filler, Plaintiff was unable to sit for any length of time, due to severe ischial tuberosity and sciatic notch pain that Plaintiff exhibited on physical examination. (*Id.*) Dr. Filler opined that Plaintiff could occasionally climb and balance, and could never stoop, crouch, kneel, and crawl. (*Id.* at PageID 1118.) Dr. Filler indicated that Plaintiff's ability to push and pull "large/heavy objects" was "affected," because "posture [and] leverage for large/heavy objects effect [sic] the buttock pain area." (*Id.*) As for environmental restrictions, Dr. Filler opined that Plaintiff's exposure to moving machinery was restricted because he was unable to lift or carry heavy objects or sit. (*Id.* at PageID 1119.) In conclusion, Dr. Filler indicated that Plaintiff could perform sedentary work but was unable to perform light work. (*Id.* at PageID 1119-20.) He noted: "No sitting [due to] sciatic notch tenderness." (*Id.* at 1120.) In the final Remarks section, Dr. Filler wrote: "We are a neurosurgery practice. We do not assess physical activity limitations." (*Id.*)

The ALJ gave "minimal weight" to Dr. Filler's February 2019 opinion. (Decision, Doc. No. 6-11 at PageID 1806.) The ALJ concluded that Dr. Filler's opinion that Plaintiff could perform sedentary work was inconsistent with his opinion that Plaintiff was unable to sit. (*Id.*) The ALJ also found that Dr. Filler's suggested physical limitations were inconsistent with his statement that he does "not assess physical activity limitations" in his neurology practice. (*Id.*) The ALJ otherwise provided the same reasoning that she used to discount Dr. Filler's November 2017 and March 2019 opinions. (*Id.*)

### 4.    March 2019 opinion

In a March 2019 letter, Dr. Filler summarized Plaintiff's treatment for pelvic and thigh pain. (AR, Doc. No. 6-10 at PageID 1519.) Dr. Filler reported that he performed a second pudendal nerve decompression surgery in August 2018. (*Id.* at PageID 1520.) Although Plaintiff initially did well after the surgery, Dr. Filler stated that "when [Plaintiff] returned to work he had a fall and his symptoms returned and have been progressively worsening." (*Id.*) Dr. Filler opined that Plaintiff was "not able to sit, stand[,] or walk for more than [ten] to [fifteen] minutes and therefore he is not able to work at this time." (AR, Doc. No. 6-10 at PageID 1520.) Dr. Filler also opined that Plaintiff "suffers greatly from his nerve pain and this is also why it is not possible for him to carry out his usual work and activities at this time." (*Id.*)

The ALJ also gave "some weight" to Dr. Filler's March 2019 opinion. (Decision, Doc. No. 6-11 at PageID 1806-07.) The explanation that the ALJ provided is nearly identical to her explanation regarding Dr. Filler's November 2017 opinion. (*Compare* Decision, Doc. No. 6-11 at PageID 1806-07, *with* PageID 1805.) The ALJ also noted that

Plaintiff told Dr. Filler in January 2019 "that his pain was being controlled well." (*Id.* at PageID 1807.)

### C.     Consultative Physician Aivars Vitols, D.O.

Dr. Aivars Vitols, D.O., performed a consultative physical examination in May 2017. (AR, Doc. No. 6-7 at PageID 649-656.) Dr. Vitols opined: "[Plaintiff] is not able to stand or walk but for very brief periods of time." (*Id.* at PageID 656.) Dr. Vitols stated that Plaintiff "has difficulty sitting due to severe groin and buttocks pain." (*Id.*) Dr. Vitols noted that Plaintiff had full use of his upper extremities. (*Id.*) Dr. Vitols concluded that Plaintiff's "overall physical capacity level" was at the sedentary level. (*Id.*)

The ALJ afforded "minimal weight" to Dr. Vitols' opinion. (Decision, Doc. No. 6-11 at PageID 1804.) The ALJ conceded that Dr. Vitols' opinion "may have been consistent with his findings," but reasoned that "the observations and findings on this one-time examination are inconsistent with findings throughout the record (Exhibits 1F-54F)." (*Id.*) The ALJ further explained:

> With rare exceptions, [Plaintiff] generally presents with an unremarkable gait and adequate strength (Exhibits 1F-54F). When strength was reduced, it improved when participating in physical therapy and receiving injections (e.g. Exhibit 45F/99-100). Even during the closed period recommended for review by the Court, his specialist noted good strength in the bilateral knees and with plantar flexion and dorsiflexion with no reproduction of symptoms with restricted motion of the hip in a seated position (Exhibit 14F/36). Furthermore, examinations usually indicate that he is not in acute distress, even during emergency room visits for his pudendal neuralgia (Exhibits 1F-54F).

12

(*Id.*) The ALJ concluded that these findings, "combined with improvement noted with modalities such as physical therapy and injections," showed "significantly better functioning" than the level described by Dr. Vitols. (*Id.*)

## IV.    LAW AND ANALYSIS

Plaintiff asserts one error: "[T]he ALJ reversibly erred by rejecting the treating and even examining medical source opinions in favor of the state agency physicians, who reviewed only a few months of medical records from the relevant time period and did not review nearly four years' worth of medical evidence, including repeat surgery and the medical assessments of specialist Dr. Filler." (SE, Doc. No. 7 at PageID 3355.) The undersigned agrees and recommends that the ALJ's decision be reversed and remanded.

### A.    Applicable Law.

Because Plaintiff's claim was filed before March 27, 2017, the opinion evidence rules in 20 C.F.R. § 404.1527 apply. The ALJ must consider and evaluate every medical opinion in the record. *See* 20 C.F.R. § 404.1527(b), (c). However, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citations omitted). Under the treating physician rule, "[t]reating-source opinions[7] must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory

---

[7] A "treating source" is a claimant's "own acceptable medical source who provides . . . medical treatment or evaluation and who has . . . an ongoing treatment relationship" with a claimant. 20 C.F.R. § 404.1527(a)(1).

diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).

"If the ALJ declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th Cir. 2004)). An ALJ's failure to balance these factors and assign a specific weight "alone constitutes error, as 'a finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected." *Cole*, 661 F.3d at 938 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)).

"Separate from the treating physician rule, but closely related, is the requirement that the ALJ 'always give good reasons' for the weight ascribed to a treating-source opinion." *Hargett v. Comm'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) (citing 20 C.F.R. § 404.1527(c)(2); other citation omitted)); *see Wilson*, 378 F.3d at 544. "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Cole*, 661

14

F.3d at 937 (quoting SSR 96-2p, 1996 SSR LEXIS 9, at *12 (July 2, 1996)).[8] For example, "an ALJ may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion." *Hargett*, 964 F.3d at 552.

The Sixth Circuit has explained that "[t]he point of the 'good reasons' rule is to permit meaningful review of the ALJ's decision and to ensure that a claimant is not 'bewildered' when an administrative bureaucracy tells him that he is not disabled." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017) (citations omitted). Given the importance of this rationale, a violation of the good reasons rule will "denote a lack of substantial evidence" that justifies reversal unless the error is harmless:[9]

> Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.

*Rogers*, 486 F.3d at 243. Courts in the Sixth Circuit therefore "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Wilson*, 378 F.3d at 545.

---

[8] SSR 96-2p has been rescinded. However, this rescission is effective only for claims filed on or after March 27, 2017. See SSR 96-2p, 2017 WL 3928298 at *1. Because Plaintiff filed his application for benefits prior to March 27, 2017, SSR 96-2p still applies in this case.

[9] "[A] failure to give good reasons could constitute harmless error . . . where 'a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it,' or where the Commissioner made 'findings consistent with the [treating-source] opinion' or where the purposes of notice and ability for meaningful review have been satisfied." *Hargett*, 964 F.3d at 554 (quoting *Wilson*, 378 F.3d at 547).

**B.      The ALJ Reversibly Erred When Analyzing the Opinions of Treating Neurologist Dr. Filler.**

Plaintiff challenges the sufficiency of the ALJ's analysis of Dr. Filler's November 2017 and March 2019 opinions. (SE, Doc. No. 7 at PageID 3364.) For the reasons set forth below, the undersigned agrees and therefore recommends that the Court reverse the ALJ's decision and remand this matter to the Commissioner.

As explained above, the ALJ must give the opinion of a treating source, such as Dr. Filler, controlling weight unless the ALJ finds that it is "inconsistent with the other substantial evidence" in the record. *Hargett*, 964 F.3d at 552 (quoting 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not give controlling weight to a treating source's opinion, then the ALJ must consider several factors when determining what weight should be given, including "the degree to which the treating source's opinion is supported by relevant evidence and consistent with the overall record." *Id*. (citing 20 C.F.R. § 404.1527(c)(2)-(6)). Finally, the ALJ must articulate good reasons for making these determinations, and those reasons must be both "specific" and "supported by the evidence in the case record." *Cole*, 661 F.3d at 937. The ALJ's analyses of Dr. Filler's November 2017 and March 2019 opinions do not satisfy these requirements.

The ALJ's first stated reason for declining to give controlling weight to Dr. Filler's opinions is that "Dr. Filler rarely examined [Plaintiff] and was therefore substantially relying on [Plaintiff's] subjective reports based on telephone calls (Exhibits 1F-54F)." (Decision, Doc. No. 6-11 at PageID 1805, 1806-07.) While the frequency of Dr. Filler's examinations of Plaintiff is an appropriate factor to consider under 20 C.F.R.

16

§ 404.1527(c), it is not the only factor that should have been considered. The ALJ erred by failing to consider whether to give Dr. Filler's opinions more weight due to his specialization and the length and nature of his treatment relationship with Plaintiff. Specifically, the ALJ failed to discuss the fact that Dr. Filler had treated Plaintiff since 2015 (*see* AR, Doc. No. 6-7 at PageID 509). The ALJ failed to discuss either Dr. Filler's specialization as a neurologist or his role as the Director of the Institute for Nerve Medicine and the Director of the Peripheral Nerve Surgery Program in Santa Monica, California (AR, Doc. No. 6-7 at PageID 858-59). The ALJ also failed to discuss the fact that Dr. Filler performed two surgeries to treat Plaintiff's pudendal nerve neuralgia. (AR, Doc. No. 6-7 at PageID 484-85, 831.) All these facts should have caused the ALJ to give Dr. Filler's opinions more, rather than less, weight. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."); 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

Further, the ALJ's conclusion that Dr. Filler "rarely" examined Plaintiff and "therefore substantially rel[ied] on [Plaintiff's] subjective reports based on telephone calls" is not based on substantial evidence. Because Dr. Filler practices in Santa Monica, California and Plaintiff resides in Dayton, Ohio, Plaintiff was required to travel in order

17

to see Dr. Filler in person. Nevertheless, Dr. Filler saw Plaintiff in person four times before the March 2015 pudendal nerve surgery. (AR, Doc. No. 6-7 at PageID 479, 484, 509, 519, 598.) After Plaintiff injured the surgical area in late 2016, Dr. Filler examined Plaintiff in person in both June 2017 and July 2018, before performing another pudendal nerve surgery in August 2018. (*Id.* at PageID 714, 830-31.) It is true that between those in-person visits, Dr. Filler spoke to Plaintiff on the telephone about his symptoms on approximately five occasions. (*Id.* at PageID 619-21, 829; AR, Doc. No. 6-9 at PageID 1499.) But given the number of in-person visits, the record does not contain substantial evidence that supports the ALJ's conclusions that Dr. Filler "rarely" examined Plaintiff and so "substantially rel[ied] on [Plaintiff's] subjective reports based on telephone calls."

The ALJ's second stated reason for declining to give controlling weight to Dr. Filler's opinions is that "[t]he most recent evaluation [by Dr. Filler] . . . does not support the limitations opined" since Dr. Filler noted "good strength in the bilateral knees, plantar flexion, and dorsiflexion" with "no reproduction of symptoms with restricted motion of the hip in a seated position." (Decision, Doc. No. 6-11 at PageID 1805-07.) This reason is also not supported by substantial evidence, as the ALJ ignored abnormalities documented in Dr. Filler's treatment notes that support his opinions.

When Dr. Filler examined Plaintiff in June 2017, he noted that despite prescribing "a number" of medications to treat Plaintiff's pain, "the recurrent symptoms have been persistent and not responsive to medication." (AR, Doc. No. 6-7 at PageID 714.) His physical examination revealed significant sensitivity over Plaintiff's sciatic notch, particularly the lower area. (*Id.*) Dr. Filler also documented aggravation of Plaintiff's

18

symptoms in the flexed internally rotated thigh position. (*Id.*) Dr. Filler did note that Plaintiff exhibited good strength bilaterally with flexion and extension of the knees and noted no strength or gait abnormalities. (*Id.* at PageID 714.) But despite those normal findings, Dr. Filler relied on the abnormal findings to conclude that there was "recurrent entrapment of the pudendal nerve as it traverses from the greater sciatic notch to the lesser sciatic notch over the sacrospinous ligament." (AR, Doc. No. 6-7 at PageID 714.) Dr. Filler stated that a second surgical neuroplasty of the pudendal nerve was warranted, "given the location of the sensitivity and the distribution." (*Id.* at PageID 714-15.)

When Dr. Filler re-examined Plaintiff in July 2018, he again did not document any strength or gait abnormalities. (AR, Doc. No. 6-7 at PageID 830.) However, Dr. Filler did find that Plaintiff exhibited sensitivity in the piriformis area, sciatic notch area, and "perhaps in the piriformis remnant or some local generalized adhesions." (*Id.*) Dr. Filler also documented "recurrence of the obturator internus spasm and pudendal symptoms." (*Id.*) Dr. Filler again recommended a second surgical procedure. (*Id.*) He performed that surgery in August 2018—almost twenty-one months after Plaintiff had re-injured the pudendal nerve. (*Id.* at PageID 831; see also AR, Doc. No. 6-7 at PageID 621.)

Because the ALJ selectively chose to rely on normal findings in Dr. Filler's treatment notes while ignoring the abnormal findings that led Dr. Filler to recommend a second surgery, substantial evidence does not support this stated reason for discounting his opinions. This conclusion is buttressed by the fact that the ALJ also did not consider Dr. Filler's status as a specialist and his knowledge of pudendal nerve abnormalities.

19

The ALJ's third stated reason for declining to give controlling weight to Dr.

Filler's opinions is that those opinions were inconsistent with other evidence in

the record. The ALJ explained:

> [R]ecords from providers that saw him more frequently indicate better
> functioning than opined (Exhibits 1F-54F). With rare exceptions, [Plaintiff]
> generally presents with an unremarkable gait and adequate strength
> (Exhibits 1F-54F). When strength was reduced, it improved when
> participating in physical therapy and receiving injections (e.g. Exhibit
> 45F/99-100). . . . Furthermore, examinations usually indicate that he is not
> in acute distress, even during emergency room visits for his pudendal
> neuralgia (Exhibits 1F-54F).

(Decision, Doc. No. 6-11 at PageID 1805, 1807.) The consistency of a treating

physician's opinions with the record as a whole is an appropriate factor to consider under

20 C.F.R. § 404.1527(c). However, the ALJ's evaluation of this factor is unsupported by

substantial evidence because, as explained below, Dr. Filler's opinions are consistent

with both significant evidence in the record and Dr. Vitols' proffered opinion.

Dr. Vitols observed during the May 2017 consultative examination that Plaintiff

appeared "quite uncomfortable" and "lean[ed] on the right buttocks due to pain reported

in the left buttocks and upper leg." (AR, Doc. No. 6-7 at PageID 653.) Although Dr.

Vitols noted normal strength in the lower extremities, he also documented significant

tenderness of the left lower quadrant and left groin, "very painful" range of motion of the

left hip, generalized discomfort to palpation of the lumbar spine, and extreme tenderness

to palpation of the left buttocks and over the sciatic nerve. (*Id.* at PageID 655.) Plaintiff

was able to rise from a seated position "with extreme difficulty," was very unsteady, and

had difficulty placing full weight on the left leg due to buttocks, groin, and testicular

20

pain. (*Id.*) Plaintiff could not perform heel and toe standing and exhibited significantly restricted motion of the lumbar spine, due to an inability to bear full weight on the left leg, poor balance, and associated left groin pain. (*Id.*)

When Plaintiff sought treatment at an emergency department in September 2017, he described his pain as "shooting" and radiating from his pudendal nerve into his chest. (AR, Doc. No. 6-7 at PageID 778.) The attending physician observed that Plaintiff was "[c]lenching his teeth in pain." (*Id.* at PageID 779.)

Plaintiff sought treatment from a pain management provider in February 2018, and complained of "constant, sharp, dull, aching, and tingling pain." (AR, Doc. No. 6-7 at PageID 825.) He rated his pain at a level of six out of ten (with ten being the highest pain) on his best days, and ten out of ten on his worst days. (*Id.*) His provider reported that a physical examination showed tenderness to palpation over the left buttock, which was "consistent with left pudendal neuralgia." (*Id.* at PageID 827-28.) The provider also noted that Plaintiff had not responded to "multiple medication trials, pudendal nerve blocks, [and] physical therapy in the past." (*Id.* at PageID 828.)

Plaintiff began physical therapy for low back pain in April 2018. (AR, Doc. No. 6-8 at PageID 1050.) He told his physical therapist that he had spent "much of his time over the past year and [three] months in bed," which he attributed to his pudendal nerve pain. (*Id.*) The physical examination showed decreased strength of the bilateral psoas muscles, hip abductors, and hip extensors, as well as decreased hamstring flexibility and left-sided pain upon straight leg raising. (*Id.* at PageID 1051-52.)

As discussed above, Dr. Filler performed a second pudendal nerve surgery in August 2018. (AR, Doc. No. 6-7 at PageID 831.) Plaintiff returned to work after surgery but re-injured himself when he fell off a ladder in October 2018. (*Id.* at PageID 829, 834.) Plaintiff returned to his pain management provider in December 2018. An examination showed tenderness to palpation over the left sacroiliac joint and positive left piriformis provocative maneuvers. (AR, Doc. No. 6-16 at PageID 2157-58.)

As the ALJ pointed out, Plaintiff told Dr. Filler in January 2019 that his pain was currently well-controlled on additional medications. (AR, Doc. No. 6-9 at PageID 1499.) But subsequent records indicate that the improvement was temporary. When Plaintiff began pain management treatment with new provider Laura Devita, M.D. in February 2019, he reported experiencing burning pain and tightness. (AR, Doc. No. 6-21 at PageID 2841.) He said that pelvic floor therapy relieved only some of the pain, and he rated his pain at a level of nine out of ten. (*Id.*) Dr. Devita reported that an examination showed tightness and tenderness in the left piriformis muscle. (*Id.* at PageID 2843.) Dr. Devita continued Plaintiff on several of his medications, prescribed Elavil, and recommended a left piriformis injection. (*Id.* at PageID 2846.)

Later records from Dr. Devita that were dated through the end of the relevant time period consistently documented left testis and/or groin tenderness and pain and tightness in the left buttock area. (AR, Doc. No. 6-21 at PageID 2853-54, 2865-66, 2877, 2891, 2898, 2906, 2918, 2929, 2943, 2958, 2970, 2977, 2990, 3002.) Dr. Devita's treatment notes also show that Plaintiff underwent numerous injections between April 2019 and the end of the relevant period. For example, Dr. Devita administered a ganglion impar block

22

in April 2019. (*Id.* at PageID 2859.) Because Plaintiff did not report any significant relief from that procedure (*id.* at PageID 2863), Dr. Devita administered a left pudendal nerve block in May 2019. (*Id.* at PageID 2871.) Plaintiff reported short-term relief—followed by increased symptoms—after that procedure. (*Id.* at PageID 2875.) Dr. Devita administered another left pudendal nerve block in July 2019 (*id.* at PageID 2886), but Plaintiff reported no significant improvement. (*Id.* at PageID 2889.) In January 2020, Dr. Devita performed a lower thoracic paraspinal trigger point injection for recent complaints of back pain. (*Id.* at PageID 2912.) Plaintiff reported 90% relief to that area when he saw Dr. Devita in February 2020 but said his groin symptoms had not improved and rated that pain at a seven out of ten. (*Id.* at PageID 2915.)

Later in February 2020, Dr. Devita administered another left pudendal nerve block. (*Id.* at PageID 2926.) In April and May of 2020, Plaintiff reported 50% relief from that procedure and rated his left groin pain at a six out of ten. (*Id.* at PageID 2927, 2934.) However, Plaintiff reported in August and October 2020 that his groin pain had slowly worsened. (*Id.* at PageID 2941, 2955.) Dr. Devita performed another left pudendal nerve block in November 2020. (*Id.* at PageID 2965.) Although Plaintiff initially reported 80% relief after that procedure (*id.* at PageID 2967), he complained in December 2020 that his pain was returning on an intermittent basis. (*Id.* at PageID 2974.) In response,

Dr. Devita administered a fifth left pudendal nerve block in February 2021. (*Id.* at PageID 2981.) Although Plaintiff reported a 50% improvement in his groin pain later that month, he complained of pelvic brim and testes pain, which worsened with intercourse. (*Id.* at PageID 2987.) Dr. Devita administered a ganglion impar block in March 2021. (*Id.*

23

at PageID 2997), In May 2021 Plaintiff said that his pain worsened after the procedure. (*Id.* at PageID 2999.) In August 2021, Plaintiff rated his groin pain at a level of five out of ten. (*Id.* at PageID 3006). Shortly after the end of the relevant time period, on October 29, 2021, Dr. Devita performed a left pudendal nerve radiofrequency ablation procedure. (*Id.* at PageID 3014.)

The ALJ ignored this evidence when she concluded that Dr. Filler's opinions were inconsistent with other evidence in the record. She also did not consider the consistency of Dr. Filler's opinions with the opinion of consultative physician Dr. Vitols, who opined that Plaintiff's "overall physical functional capacity level [was] at the sedentary level." (AR, Doc. No. 6-7 at PageID 656.) Dr. Vitols further opined that Plaintiff was able to stand and walk for only "very brief" periods of time and had difficulty sitting due to severe groin and buttocks pain. (*Id.*) Although Dr. Vitols' opinion is consistent with Dr. Filler's November 2017 and March 2019 opinions that Plaintiff was unable to sit, stand, or walk for more than ten to fifteen minutes at a time, the ALJ ignored that consistency.

The Court recognizes that the ALJ need not discuss each and every piece of evidence and finding in the record. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). Nevertheless, the ALJ's "factual findings as a whole" must show that she "implicitly resolved the conflicts in the evidence." *Id.* Here, the ALJ's failure to acknowledge the consistency of the opinions of treating physician Dr. Filler and consultative examining physician Dr. Vitols leads the undersigned to conclude that the ALJ did not resolve conflicts in the evidence. Further, the ALJ's apparent failure to consider significant evidence that contradicts her conclusions signifies an impermissibly

24

selective review of the record. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record"); *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports")).

For these reasons, the undersigned concludes that the ALJ did not comply with the treating physician rule or provide good reasons, supported by substantial evidence, for discounting Dr. Filler's opinions. These failures constitute reversible error. *Hargett*, 964 F.3d at 554-55 (noting that the Sixth Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion") (internal quotations and citations omitted).

### C. The ALJ Reversibly Erred When Analyzing The Opinion Of Consultative Physician Dr. Vitols.

Dr. Vitols was not Plaintiff's treating physician. Instead, he examined Plaintiff on one occasion at the request of the Division of Disability Determination. (*See* AR, Doc. No. 6-7 at PageID 653.) Dr. Vitols is therefore not a treating source under 20 C.F.R. § 404.1527(a)(1), and his opinion is not entitled to controlling or deferential weight. 20 C.F.R. § 404.1527(c)(2); SSR 06-03p at *2. Nevertheless, the ALJ was required to consider Dr. Vitols' opinion and apply the factors in 20 C.F.R. § 404.1527(c).

As with Dr. Filler's opinions, the ALJ discounted Dr. Vitols' opinion on the basis that it was inconsistent with other evidence in the record. (Decision, Doc. No. 6-11 at PageID 1804.) The ALJ cited the same evidence that she relied on to discount Dr. Filler's opinions. (*Compare* Decision, Doc. No. 6-11 at PageID 1084, *with* PageID 1805, 1807.)

25

For the same reasons discussed above with regard to the ALJ's consistency analysis of Dr. Filler's opinions, the undersigned concludes that the ALJ's analysis of Dr. Vitols' opinion is not supported by substantial evidence. Further, the ALJ's failure to acknowledge significant evidence in the record that supports Plaintiff's complaints, as well as the consistency of Dr. Vitols' opinion with the opinions of Dr. Filler, leads the Court to conclude that the ALJ did not resolve conflicts in the evidence. The failure to consider evidence that contradicts an ALJ's conclusions signifies an impermissibly selective review of the record. *See Gentry*, 741 F.3d at 723; *Germany-Johnson*, 313 F. App'x at 777 (6th Cir. 2008). Accordingly, the ALJ's analysis of Dr. Vitols' opinion constitutes reversible error and provides another reason to remand this case.

## V.    REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. However, Plaintiff is entitled to an Order remanding

26

this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to the medical opinion evidence, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for SSI and MQGE should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.  Plaintiff's Statement of Errors (Doc. No. 7) be GRANTED;

2.  The Court REVERSE the Commissioner's non-disability determination;

3.  No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.  This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.  This case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after

being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).